NABORS v. ALEXANDER. See Case No. 2,064.

## Case No. 10,003.

NACHTRIEB v. The HARMONY SETTLEMENT..

[3 Wall. Jr. 66; [1] 12 Leg. Int. 98.]

Circuit Court, W. D. Pennsylvania. April Term, 1855.

RELIGIOUS SOCIETIES—CONFIDENTIAL RELATIONS—ADMISSIONS AGAINST INTEREST — CONTROLLING POWER OF JUDICIAL LAW — SOCIAL PARTNERSHIP.

1. The relation of a spiritual ruler with his people is so confidential, and one of such inequality, that courts watch it narrowly as liable to abuse; and considering that free will can hardly be predicated of acts done by a person at the direction of such ruler or superior, will treat as of very little intrinsic value, receipts or releases, given by a person so dependent, by such direction against his own interest.

2. Admissions, such as might be considered the natural effusions of mortified pride or vanity, though clear and distinct against a party's interest, are entitled to but little weight as evidence against him.

3. The law allows no communities, however independent in their structure of general society—or however long established—or however much in the habit of regulating, as a community in a community, their own concerns,—to be above its constant and complete control. And even where such communities are well formed, and have been long existing with order and success, the court will neither enforce nor allow their peculiar arrangements, if against common right, further than the parties have agreed to enforce and allow them. In case of the violation by such a community, of a party's rights, as the law and the court deem rights, the court will interfere, and dealing with the community as a defendant, will override its administrations, plans and opinions; and will enforce rights and duties as it and such law deems them, irrespective and in violation of the general administration, plans or opinions.

4. In a social partnership, where an absolute community of property with right of survivorship, on the one hand, and care, by the community, of every member, through life, on the other—is the fundamental and pervading principle: if one member be unjustly expelled by an usurped though unquestioned authority, not having under the clear terms of the association any right to expel him, the court will not oblige him to return to the association (there not being on its part an offer of full and satisfactory reconciliation and reception), but will interfere with the fundamental and pervading principle: and though the expelled member brought nothing into the community, will give to him, for him-

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

self, a separated and individual part of the property. And where payment for the party's services at the ordinary rate of services like his—during many years that he was a member—would give to him more than his numerical proportion or share of the whole capital stock, and where the question of profits was a little obscure, the court regarding this as the simplest and most natural justice, gave to him his numerical share or proportion of the whole capital stock, from whatever source arising, as the same existed at the time he was expelled, irrespective of the amount which he found in the association when he became a member.

In the year 1805, one Rapp, calling himself the Reverend George Rapp, as chief or superintendent, with a number of his countrymen, emigrants from Germany, formed, by a solemn compact in writing, embracing many particulars, the well known social arrangement at Harmony, in Butler county, Pennsylvania, called sometimes Rapp's Settlement, and sometimes the Harmony Society. The causes which led to this association, were declared to be "the existing state of society and the Christian church, as well in America as Europe; and a conviction that this condition had been caused by a departure from the theory of common property and community of interests and of labor, set forth in the primitive apostolic church, and a firm persuasion that a return to the plan of the said primitive church would have the effect to promote the temporal and eternal happiness of all such as should embrace it." The compact, accordingly, had for its basis, "Christion fellowship, the principles of which being faithfully derived from the sacred Scriptures, include the government of the patriarchal age, united to the community of property adopted in the days of the apostles." It required on the part of the members severally, and in their social capacity, entire submission to the laws and regulations of the community, and a ready obedience towards the appointed superintendents thereof; and obliged the superintendents to a patriarchal, which included a pastoral and parental supervision, regard and fidelity. Many of the founders were poor. Some had property. All of them, severally and jointly, conveyed it in fee to Rapp and his successors, superintendents, for the mutual and equal participation and enjoyment of all the members; and the property itself, with the increase thereof, however contributed or arising, was declared to be, then and forever, joint and indivisible stock, with the right of survivorship to those who lived longest. The restoration of property is declared to be of "pernicious tendency, and which cannot be enforced with uniformity and fairness," and "should any individual withdraw from the society, it is declared that he is not to be entitled to demand an account of the contributions he may have made, whether in lands, goods, money or labor, or to claim anything from the society as a matter of right, but it shall be left altogether to the discretion of the superintendent to decide whether any, and if any, what al-

lowance shall be made to such member as a donation." Since the foundation of the society in 1805, many of its members have died while in "communion" thereof. A large number of them were aged men and women. None ever left a last will or testament, or desired distribution of the contributions or earnings among their heirs at law, nor had administration ever been taken out in the settlement. Neither did any of them, except Rapp, appear to know anything about the property of the settlement. In 1847, Rapp himself, after a laborious devotion of forty-two years to the interests of his settlement, died intestate, leaving no property.

Celibacy was enforced, and except in one or two cases which Rapp allowed and judged of, incredibly few marriages had been allowed in the community in the course of half a century. "He taught," said the testimony, "not to marry at all, and that those that will marry, or would marry, would be damned, for they must leave the society. They could not live there. He won't suffer it at all. As he is father, king, and priest, he has the right to do with us as he thinks proper. Christ would ask him in the other world, if we were fit or suitable for the kingdom of God." Where married persons came into the society they were not allowed to cohabit, nor have intercourse as man and wife. The relations of parent and child, brother and sister, as well as those of husband and wife, were merged in the grand social obligation. The society was to take care of the sick and aged. (Of poor, and rich, of course, there were none.) If a mother was sick, and her daughter lived out of the limits, she could not be invited to come and see her; and the "reward" of the brother who brought his sister to their sick mother, would be "to be damned, or to be the last that came out of hell, or somehow, or in this manner;" such being the lucid conception that one of Rapp's disciples seemed to have of his master's dogma on this subject. The study of the English language was discouraged, and German was the ordinary tongue.

The compact contained no enumeration of offences by which a member should forfeit his rights and interest in the common stock—nor did it fix or refer to any tribunal which should have the power to inflict expulsion. And although the members all covenanted to give implicit obedience to "the laws and regulations of the community," it did not appear that they had ever made any code of regulations or bylaws. The will and word of Rapp was in fact the only law. The government was patriarchal, that is, absolute; Rapp exercising all power, civil, religious, temporal and spiritual. He was priest and king, having absolute control over the fate and fortunes of his followers, not only in this world, but (as they were told and appeared to believe) in the world to come. If they obeyed his precepts, their names were to be written in the "Lamb's Book of Life," otherwise, they

were to suffer in purgatory some millions of years, if not forever.

The members were allowed by Rapp to walk within the limits of the settlement, and to converse with one another; but to hold intercourse with any seceded members (of whom since the settlement in 1805, there had been several, some going on one or two occasions—as on a memorable one in 1832, under a Comte de Leon—in bodies) was a thing entirely forbidden. And when done, Rapp would deal with the offender in the way of discipline; sometimes excluding him from love-feasts, sometimes (as the testimony said), "to make it impressive," ordering him to be fed on bread and water, sometimes "to make it more impressive still," ordering that he should have no food at all, and sometimes, doubtless to give to it the consummation of effect, turning him directly out of the society.

Notwithstanding the peculiarity of this community, it had thus far been very prosperous. In the course of fifty years, not one single member of the society had ever been criminally prosecuted. External order, cleanliness, and apparent tranquility, marked the settlement; and though occasional "indiscretions" occurred among the women, and certain discontents appeared to prevail with the men, it had thus far been a moral, well-governed and contented body; and the social problem is considered by some persons as yet in a course of favorable solution.

But the more immediate case, to which the foregoing is a general, though not entirely irrelative preface, was this: One Joshua Nachtrieb had joined the society, without any property, in 1819; and had remained a peaceful and useful member for twenty-seven years. In 1846 certain seceding members, who professed to have claims against the society, and had given Rapp a good deal of anxiety, met Nachtrieb, with one or two others, and held a few short conversations with them on the subject of their demands and discontents. They inquired of Nachtrieb whether the society was willing to do anything for those who had left it and got nothing—whether Rapp had brought their request before the society; matters to which Nachtrieb answered that nothing had been done or said in the society about their getting anything. Rapp hearing of the meeting and colloquy, proceeded to discipline. Nachtrieb and the others were summoned to Rapp's house. "When Rapp came in," said the testimony, "he commenced on Joshua and said, 'Now let us give them fellows our judgment—Joshua, you are to blame for all this.' Joshua said, 'He did not know it was wrong or he would not have done it.' Rapp said, 'You intended to raise a mob.' Joshua said, 'No; if I had thought it was wrong to go there, I would not have done it.' Rapp then said, 'You must go right off and leave the town.' Joshua pleaded off, said he was sorry, said

he would not go. Rapp said, 'No; we won't have you—you must go.' A night or two after this, the society being all present at a religious meeting, one of the elders, when the services were over, said to Rapp, 'There is something to be said.' Rapp then observed from the pulpit, 'Something has taken place lately—it is this: Joshua Nachtrieb and some others have gone out and conversed with their friends who left us. He must now leave the society; we cannot have such men.' Rapp then asked if he was present. Nachtrieb said, 'Yes, father, I am here.' Rapp said, 'What are you doing here? I thought you had gone.' Nachtrieb said, 'He was sorry if he had done anything wrong, and that if it had happened it should not happen again.' Rapp answered, 'Any fool can speak so; we cannot use such men; you must leave the society; you must be off.' Rapp then inquired of the society if they agreed with him—they said yes. Rapp then said to Nachtrieb, 'Now you know what you have to do: thy father himself, don't want you any longer.' Nachtrieb went away two days after, having previously received from Rapp $200, and signed this receipt, which it was not shown had been obtained by any specific fraud or misrepresentation: To-day I have withdrawn myself from the Harmony Society, and ceased to be a member thereof. I have also received from George Rapp, two hundred dollars as a donation, agreeably to the contract. Joshua Nachtrieb. Harmony, 18th June, 1846."

Soon after this Nachtrieb declared to several of the members, that he was glad to go away—was tired of the society—and that he did not depart from any compulsion. The property of the concern at this time amounted to $901,723.42, and there were 321 members. So that if Nachtrieb had received a full share of the concern, as on a division, he would have got about $2,809.10.

In this state of things, Nachtrieb having married after his departure, and got children, now filed a bill in chancery—this suit—against the Harmony elders or trustees, setting forth his joining the society in 1819, being then 21 years old; his faithful and diligent labors in its business, receiving nothing in return but a bare maintenance; and that in June, 1846, being then 48 years old, and worn out with labor, he was wrongfully excluded from the society, turned out of its possessions, and deprived of participation in its property and effects, by the fraud, &c., of Rapp and his associates. The bill prayed an account "of the sums due complainant, for his labor and services in said association, and of the share he was justly entitled to, in the property and estates of said association, and the profits accrued during his membership, and that the same may be decreed to him."

The respondents, in their answer, admitted that the complainant was a member of the

association, as stated in his bill, and that up to 1846 he had labored diligently in the affairs and business of the association, increasing its wealth and promoting its interest agreeably to the terms and spirit of their mutual compact—and that the association had prospered in its temporal affairs, having, from small beginnings, become the owner of property to a considerable amount.

It then averred that the complainant, during the period of his membership, enjoyed all the benefits, advantages, and comforts, individual, social, and religious, which were enjoyed by the fellow members, and all that were contemplated in forming the association and to which he was entitled by the terms and spirit of their agreements, and was entitled to be maintained, cherished, &c., by the association; one of the objects of the society being that of making old age comfortable and free from cares or the necessity of labor. But it denied that the defendant was wrongfully and unjustly excluded from the association. On the contrary, it averred that the complainant voluntarily and of his own free will separated himself from and abandoned said association, and consequently, according to the terms of their articles of association, was not entitled to any compensation for his labor and services, other than that which he received in his support and maintenance, instruction, &c., while he remained a member.

On this case, two questions arose:

1. A question of fact: Whether Nachtrieb had "withdrawn" from the society; and so, under the articles of compact, lost his right to demand any account of its property, and bound himself to take such allowance as "the discretion of the superintendent might decide should be made to him as a donation?" or whether he was improperly expelled, and had some further rights against the society?

2. A question of law: Supposing the last to be the case, viz., that he had been improperly expelled, what was the exact nature and extent of the remedy to be awarded him? Whether he was entitled to compensation for his labor during the time that he had been in the community? or whether he was entitled to a share of the profits made since he was there? or whether he was entitled to an equal and separated share of the whole property as it stood at the time of such expulsion? or finally, whether under so peculiar a kind of contract and arrangement as that which lay at the base of this community, he could, under any circumstances, ask more than a restoration to his ancient membership and its rights.

The whole capital of the Harmony Society when Nachtrieb entered, in 1819, was $368,690.92, and when he was expelled in 1846, it had increased, as has been already stated to $901,723.42. A numerical share being 1/321 part, in this last sum would be $2,809.10. His labor, if paid for during the twenty-seven years, at what was proved to be the ordinary rate of labor, would give him $4,290, and this last, as giving him the largest compensation, was what he claimed. If the court, disallowing this claim, and thinking further that he was not entitled to a share of the capital of 1846, should think him entitled to profits only since he came in, then he regarded as profits the increase between 1819 and 1846, on the capital as found at these two dates, that is to say, $533,032.50, and claimed as his share of them the 1/321 part.

The case was well argued by Mr. A. W. Loomis for the society, who, after insisting on the first point, the point of fact, that there was no expulsion, where he relied much on the word "withdrawn" in the receipt, contended on the second point, the point of law, as follows:

I. The complainant is not entitled to a decree for compensation for his labor during the time he remained in the society as a member. All his rights and claims spring from the articles of agreement or association. These create and define the rights and obligations of both parties. His right cannot arise from implication. There can be no pretence that the respondents have employed the complainant to perform services for them. The right to recover for such services must be found, if at all, in the agreements. Such a claim could never have been contemplated by the parties. Running through a period of twenty-seven years, (twenty-one beyond the limitation provided by law,) against a voluntary association, whose members have been continually changing, by the death and withdrawal of some, and the accession of others, such a claim against the present defendants only cannot be sustained upon any known legal or equitable principles.

Conceding the value of the services, the injustice of allowing the complainant to recover for services rendered, is thus shown: He claims $4,290 as compensation. The whole value of the property at the time he left was $901,723.42. This divided by 321, the number of members entitled to community of property at that time, yields $2,809.10. This deducted from $4,290, would leave a balance of $1,480.90 more in his favor than any remaining member would receive were the whole property of the society divided pro rata among the members. Again, the property belonging to the society, June, 1819, when the complainant became a member, amounted to the sum of $368,690.92. This sum deducted from $901,723.42, the amount of property belonging to the society when he left in June, 1846, would leave the sum of $533,032.50, which, divided by 321 would yield $1,660.53, which deducted from $4,290.00, the value of his services, would leave $2,629.47 to be received by him more than the other members, or more than

his share of the increase of the property of the society during the time he was a member thereof.

II. When we consider the complainant's claim of a share of the profits while he was a member. The whole property of the society amounted, at the time the complainant left, to less than $902,000.00. What, then, were the profits of the society during the period of complainant's membership, from June, 1819, to June, 1846, a period of twenty-seven years? Deduct from $901,723.42, the amount of property when he left, the sum of $368,-690.92, the amount of property owned by the society when he became a member, and add to the latter sum interest thereon for the period of twenty-seven years, and his share of the profits, if any, will be ascertained:

Amount of property owned by the
  society, in June, 1819......... $368,690 92
Interest for twenty-seven years.. 597,279 29

  Principal and interest ....... $965,970 21
                                   901,723 42

Exceeding amount of property
  owned by society in 1846....... $ 64,246 79

—And showing that during the twenty-seven years of complainant's membership the society made no profits; but, on the other hand, taking into consideration the capital and interest thereon, there was a deficiency of said sum of $64,246.79.

Equity would seem to require that the complainant should pay to the society his share of this loss, rather than that the society should pay anything to him.

III. Neither is the complainant entitled to an equal share of the whole property as it stood, when he left the society in 1846. What was his interest in the property at that time? The character of that interest had been fixed and established by his own free and voluntary action. He had no individual right to it whatever; it was declared "forever joint and indivisible stock;" he could transfer no title to another; no interest could pass from him by devise or descent. He could only enjoy the property or benefits secured by his contracts so long as he continued a member of the association. How then can he obtain a decree for his share of the property? His right is to secure sustenance, &c., during membership; his claim is to recover compensation for services, and to a share of the property of the association, to be held and enjoyed in severalty. This he cannot recover, so long as he remains a member of the association, for the reason that no several enjoyment is permitted by the letter or spirit of the agreement, so long as he continues a member, nor afterwards, for the reason that the property is expressly declared by the agreement forever indivisible. The right to its enjoyment is incident to membership, and membership is essential to the right of enjoyment. Individual ownership and dominion, possession and enjoyment in severalty, are utterly inconsistent with the nature of the title, the quality of the estate, and the incident of tenure. The character of neither can be changed by the election of an individual, or without the assent of the owners. The validity of such an agreement as that entered into by Nachtrieb with the society is clearly recognized by the supreme court of the United States in a case very like this. Goesele v. Bimeler, 14 How. [55 U. S.] 590, was the case of some religious separatists from Germany, who founded a society at Zoar, in Ohio, on the principle of "a community of property." A member having died, his heirs sought to have his share of the property; but McLean, J., in delivering the opinion of the court, declares that the ancestor of the complainant renounced "individual ownership of property, and an agreement was made to labor for the community, in common with others, for their comfortable maintenance; all individual right of property became merged in the general right of the association; he had no individual right, and could transmit none to his heirs." If he had no individual right, and could transmit none to his heirs, how, it may be asked, could he pass such right to another, or claim to enjoy it himself in severalty? Yet that is what the complainant here seeks to do.

So long as the complainant continued a member of the association, so long his right to the participation and enjoyment of all its stipulated privileges, immunities and benefits was complete and perfect. If he withdrew from the society and ceased to be a member thereof, his interests in its rights and property ceased. If he were wrongfully and unjustly excluded from the association; turned out of his possession, and deprived of all share and participation in its property and effects, its benefits and advantages, by fraud and combination, such exclusion and deprivation did not divest him of any property, or terminate any of his rights. His interest in the property of the society would remain precisely the same after such exclusion as it was before. Such exclusion could not change either its nature, duration or extent, nor extinguish any of his rights.

IV. The complainant has, therefore, mistaken his remedy, which is restoration to membership. The society is bound in equity to the performance of its contracts. By that contract the complainant was bound to contribute his services, if in health, for the benefit of the association; he was entitled to the enjoyment of its property whilst a member, in connection with the others, as joint and indivisible stock. He was entitled to food, clothing and sustenance when in health—to care, nurture and attention in sickness. He had a right to a home—the comforts and enjoyments of a home in the society. He could not be properly or legally deprived of these so long as he performed his own duties. If wrongfully excluded from the enjoyment of them, such exclusion could

not operate as a forfeiture of property or termination of right of enjoyment. He claims, as Judge McLean says, that the heir of Goesele did, in the case already cited, "pay for his labor." But the answer which the court gave in that case is our answer here also. "He has been paid for this in pursuance of his own contract. In sickness and in health he has been clothed and fed, and a home provided for him." It is not pretended by the complainant in his bill that, up to the time of his alleged expulsion, the society had not performed all its duties towards him; that he had not received and enjoyed all that had been stipulated or promised. Then it is clear that, up to that period, no recovery can be had for services, when the entire stipulated compensation had been provided and furnished by one party, and received and enjoyed by the other. It is equally clear that no account can be taken, or decree promised, for subsequent services, for the very obvious reason that none were rendered. His appropriate remedy is, then, a restoration to the enjoyment of that which his contract promised and secured; a performance by the society of what it promised to perform; a decree for complete and perfect restoration to the enjoyment of the rights and property of which he had been improperly deprived; a specific performance by the society of its agreement. This could be attained by petition and decree for restoration to the full and complete enjoyment of all his rights and privileges as a member; by restoring him to the bosom and privileges of the society, a full, complete and adequate support by the society, under the order, direction and supervision of the court or its officers. In the case of Com. v. St. Patrick's Benevolent Society, 2 Bin. 441, the supreme court of Pennsylvania ordered a peremptory mandamus to issue against the society, to compel the restoration of John Binns (who had been illegally and improperly excluded) to his standing as a member of the society. If a court of law could compel such restoration to standing as a member of a benevolent society, a court of equity can decree such restoration to the rights and privileges of a member in a voluntary association, whose articles expressly secure to the complainant the enjoyment of such rights and privileges, and bind the respondents to provide and furnish them. Such remedy is appropriate, but the complainant must seek it by a new bill, of different and appropriate structure and prayer.

After argument on the other side by Messrs. Shaler, Stanton, and Umbstaetter, the opinion of the court was given by

GRIER, Circuit Justice. On the first question; the question of fact: Although by the contract and agreement of the several members of this association, each had an equal right to and interest in their common property

and had estopped himself from even setting up any claim for property or labor contributed to the common stock, in case of a voluntary withdrawal from the society; yet it contained no enumeration of offences by which a member should forfeit his rights and interest in their common property; it pointed out no tribunal which had a power to inflict the punishment of expulsion or forfeiture of all title to an immense property gained by their common contributions and labor. In dealing with rights of persons and property, the court can only look at the agreements of the parties, as written and signed by themselves. In these we have found no power conferred on Rapp to expel, at his mere whim and caprice, any unoffending or even offending member, and divest his title to the common property, after the labor of a life, spent in assisting to accumulate it. If he could expel one member in this way, he could another, and thus get rid of all the partners but himself, and retain the property for his own use.

That parties wrongfully expelled would have a right to the interference of courts of justice, has not been disputed. Nor has it been pretended that the evidence shows any case which could justify the expulsion of the complainant. He had been a faithful, diligent and laborious member of the association for thirty of the best years of his life, obeying every command and ordinance of Rapp, even to that of enforced celibacy. The only offence charged against him was holding a few minutes' conversation with some of his friends out of the society, who were anxious for some information as to the fortune of certain claims which they had made on the Harmony Society. No charge seems to have been made against him, save that of thinking and speaking about the concerns of the society to which he belonged.

We come, therefore, to the point on which this case turns. Did the complainant voluntarily and of his own accord abandon and forsake the society? or was he wrongfully and unjustly excluded or expelled therefrom? As we have seen, there was no proof of any act of the complainant which would justify his expulsion. The argument has therefore turned entirely on the fact of expulsion or voluntary abandonment.

Nachtrieb's receipt, in which he in terms declared that he has withdrawn from the society, is much relied on; and so have his own declarations soon after he went away, that he had left the society voluntarily.

In regard to the receipt, when we consider the nature and extent of the authority exercised by Rapp, over his followers—their reverence and fear of him, and their unbounded submission to his command—it must be evident that the signature of such a receipt would be but slender evidence that the complainant acted voluntarily in withdrawing himself from the society. It is plain that if Rapp commanded him to go, he would feel

bound to go, and that unless, after a servitude of thirty years, he was willing to go penniless. he must sign the receipt. It was the consideration for the means of departing without being reduced to beggary. As yet the complainant was not free from the shackles of the spiritual and temporal slavery to which he had been all his life subject; a power which forbade him to learn English, to marry, or if married, denied him intercourse with his wife. Free will can hardly be predicated of actions, performed at the command of a ruler believed to possess the keys both in this world and the next, and who taught that disobedience to his orders was a sin against the Holy Ghost, not to be forgiven, here or hereafter.

If the complainant departed from the society in obedience to the commands of Rapp, it may be said he obeyed them voluntarily, as there was no physical compulsion. But we may easily conceive of a social or spiritual excommunication, or a combination of both, which would leave as little choice to the party who feared them, as the rack or the inquisition. So also the declarations of the complainant, that he went away voluntarily, can have very little or no weight against the clear evidence of his expulsion. This sort of testimony is seldom worthy of any reliance. It cannot be contradicted. Conversations are always but partially recollected, never truly stated, and often purposely misrepresented. Besides, if the conversations stated, were literally and strictly true they amount to nothing. I presume every member of this society felt uneasy, as to what would be the state of it after Rapp's death; and may well have doubted, whether a community of property can well exist without an infallible apostle with patriarchal or absolute power, so that unity may be attained by having but one will in the society. That the complainant after his expulsion, may have exulted in his first taste of the sweets of liberty; that he may have frequently said that he came away of his own accord, may well be admitted. Probably there are few instances, where a man has been expelled from any respectable society, in which his personal vanity would not soften the word expulsion into withdrawal, in speaking of his change of connection with it. An expelled member seldom expresses much respect for those who have wrongfully ejected him, or affects to regret the loss of their society.

The plaintiff is therefore entitled to a decree, and the only question which remains is, what is the character and the extent of the relief which we shall give him. We shall not consider the objection to the form of the pleadings; for the case having been argued and considered on the merits, without objections, until a late time as to that point, we shall not go back to decide a game of sharps between the parties.

On the second question; the question of law: The complainant demands pay for his labor during the time he was a member. This would be the extreme and longest rate of compensation. The defendants, on the contrary, without tendering in their answer a reconciliation with the complainant, and a restoration of him to his rights, or intimating a willingness to receive his wife and children as members, now insist that the court can decree no other remedy than restoration to his rights as a member. Such a decree would compel him, perhaps, to forsake his wife and children, for the small hope of the survivorship in the tontine. This, we think, would be rendering very scant justice or recompense to a man for half his life's labor. The Pennsylvania case cited has no resemblance to the present. That was a corporation for benevolent purposes, where membership and not the ownership and enjoyment of property to the corporator's own use, was the object. Its members accumulated to give away, or to expend on charitable purposes. These accumulated for themselves. They have, by joint labor, accumulated property of great value, which they hold as joint owners. The complainant had an equal ownership with his three hundred and twenty partners. By their contract, it is to remain joint and indivisible stock forever, but the complainant has his right to enjoy it equally with his fellows. Their articles of partnership or association provide for the case of any partner who chooses to withdraw or depart from it; but makes no provision for those who are unjustly driven away and expelled. Whether the society be governed by prophet, priest, king, or majority, they are subject to the law of the land; and if the complainant has been wrongfully deprived of valuable rights of property, the law should afford him a remedy. I know of no other measure of satisfaction or compensation more just than to give the expelled and injured party his several share of their joint assets. The dissolution of the partnership by the wrongful act of the majority of the firm or association, necessarily dissolves, inter sese, viz., as between the expelled and the remaining partners, the covenants as to the indivisibility of their joint property. If this were otherwise, a majority could at any time expel the minority, and retain all the joint property. They who break the agreement as to perpetuity of the benefits of membership cannot be heard to allege it as to destination of the property. By their wrongful expulsion of the complainant, the whole power and force of the articles as between them is broken, and inter sese, annulled; and the complainant has a right to the separate use of his heretofore undivided interest in the property, because he is wrongfully deprived of his joint use of it. The wrong done to plaintiff, is capable of a compensation in money. without compelling him to leave his family, and spend his days among those who have injured him. And the proper measure

of his compensation is the amount of his interest or share at the time of his expulsion. It is not like a mere corporate privilege or office, to which a court of equity may restore a corporator who has been wrongfully expelled. It is a question of the enjoyment of property. His copartners have ejected him from his joint use and enjoyment of their common property; they have severed the tenure, as between him and themselves, and he has a right to his share in severalty. This is the proper measure of the complainant's compensation, and not wages for his labor during the time of his membership. Let the decree be for the 1/321 part of the whole property of the society, $901,723.42, at the time of his expulsion, with interest from that date; deducting what the complainant has received.

Decree accordingly.

NOTE. In a case brought by another complainant against these same defendants, there being imperfect evidence of any expulsion, and the defendants by their answer, "conceding the complainant's perfect right and liberty to return to the enjoyment of all the privileges, benefits, and advantages contemplated by the association, he discharging the duties incumbent on him as a member of it," the court refused to grant the complainant any relief, but dismissed his bill with costs. Lemix v. Harmony Society [unreported].