**In re Perry Lee CRUTCHER, Debtor.**

**Perry Lee CRUTCHER, Edward Sparkman, Chapter 13 Standing Trustee, Plaintiffs,**

**v.**

**Lawrence SMITH and Keith Winters, Defendants.**

**Bankruptcy No. 96–18655DAS.**
**Adversary No. 97–0055DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 13, 1997.

Lewis P. Hannah, Philadelphia, PA, for debtor.

Ronald J. Harper, Philadelphia, PA, for defendants.

Edward Sparkman, Philadelphia, PA, for plaintiff–trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant proceeding ("the Proceeding") is an action in which PERRY LEE CRUTCHER ("the Debtor") and EDWARD SPARKMAN, CHAPTER 13 STANDING TRUSTEE ("the Trustee") are the Plaintiffs and which seeks to obtain an accounting of a dissolved partnership which included the Debtor and to recover damages against the Debtor's former two co-partners caused by the Defendants' alleged wrongful exclusion of the Debtor from the partnership in January 1996 and thereafter. We conclude that the partnership must be deemed dissolved as of January 31, 1996, and, considering the parties' cross-accusations of wrongful conduct, we fix the damages due to the Plaintiffs at $5,000, initially payable to the Trustee and conditioned on the obligation of the Defendants to hold the Debtor harmless from any partnership liabilities arising subsequent to the dissolution.

### B. FACTUAL AND PROCEDURAL HISTORY

The Proceeding involves an informal, oral partnership agreement formed by three individuals to operate a retail pretzel stand in the Philadelphia International Airport, designated as "Express Pretzel" ("the Business"). The Debtor conceived the idea to start the Business in early 1995. He invited Defendant LARRY SMITH to attend a minority small business seminar with him in February 1995 to learn about the start-up of such a business. Smith later invited Defendant KEITH WINTERS to join the venture. All three parties were employees of an airline which served the Airport, and they believed that they could supplement their earnings

while spending their off-hours running the Business.

The Debtor completed all the necessary formalities to establish the Business as an operative franchise, which included obtaining the Federal Identification Number, food license, business license, and a monthly space lease from an entity known as Marketplace Redwood. The three partners had an oral agreement that each would contribute an equal amount of time and money to the business operation, and they would share equally in the profits. Each partner made an initial capital contribution to the partnership of $800.

In June 1995 the Partners opened a business account at PNC Bank ("PNC") in which the Debtor initially deposited $110 to open the account. Shortly thereafter, without advising his co-partners, the Debtor used the funds in this account for his personal expenses. In or about November 1995, shortly after the business began, the parties agreed that the Debtor, who was having marital and financial difficulties, could take an advance of $500, covered by his check to Smith in that amount. The check turned out to be unsupported by sufficient funds, although the Debtor claimed that he had informed Smith in advance that the check would not clear.

The Business opened on November 22, 1995. In its first month of operation the business did quite well, reaping a profit of $3,600 for the month of December. The parties decided to distribute a $1,200 share of the profit to each around Christmas time. The Debtor allegedly promised to repay the $500 upon receipt of his share, but failed to do so.

Moreover, on January 3, 1996, the Debtor, suffering from emotional disorders relating to his marital difficulties, was hospitalized for several days. Upon notice of the Debtor's condition, the Defendants immediately contacted PNC to inform its officials that there were problems with the account. An alert was placed on the account to notify officials of any attempted withdrawals by the Debtor. The Defendants also opened a new account on behalf of the partnership, bearing only their names.

As to the events that followed, there are factual disputes among the parties. The Debtor claims that, upon his return from the hospital, he repeatedly requested that the Defendants allow him to work and to participate in the Business. The Debtor also asserts that the Defendants refused his repeated requests to provide him with either an accounting of the Business profits, so as to ascertain the value of his partnership interest in the Business, or a share in the profits derived from the Business. The Debtor further contends that his attempts to remain in the partnership, or to receive the value of his partnership interest, continued throughout 1996 and until institution of the Proceeding. He therefore presently asserts that the partnership did not dissolve until January 31, 1997, when the Proceeding, designated as a Complaint in Mandamus [1] and for Damages, was filed, requesting that the Defendants provide him with an accounting and a share in the Business's profits. The Trustee was joined as a party plaintiff to the Proceeding in an Amended Complaint filed on February 28, 1997.

The Defendants, on the other hand, claim that as of January 31, 1996, the partnership was dissolved. They assert that the Debtor not only admitted that he was unable to fulfill his share of obligations in the partnership, but suggested that the Defendants buy out his partnership interest at that time. They further claim that they offered to pay the Debtor one-third of the equity of the Business through January 31, 1996, less the value of the Defendants' wages, but that the Debtor rejected their offer and made no counteroffer nor any effort to rejoin the Business.

The Defendants subsequently continued to operate the Business without the Debtor's participation. On May 8, 1996, the Defendants purchased a house located on 530 Ritner Street, Philadelphia ("the House"), with partnership funds and without the consent of, or notice to, the Debtor. The deed to this

---

1. As an action in mandamus traditionally refers to actions to remedy breaches of judicial power, *see* BLACK'S LAW DICTIONARY 866 (5th ed.1979), it appears that this designation is a misnomer.

property was taken in only the Defendants' names. The House is allegedly vacant at present, but is a duplex which is being considered for potential rental.

The Debtor filed the underlying individual Chapter 13 bankruptcy case on September 11, 1996. After an Order was entered on October 24, 1996, granting dismissal of the Case for failure to file required documents, an Order was granted by this court to reinstate the Debtor's case on November 14, 1996. The original confirmation hearing was scheduled on March 23, 1997. That hearing is listed for a fourth time on June 24, 1997, and the Debtor is under order of May 20, 1997, to achieve confirmation at that time or suffer dismissal on the Trustee's motion. Resolution of the Proceeding would not appear to be a factor in the confirmation process.

When the Debtor objected to any continuance, the trial of the Proceeding was commenced on the first scheduled trial date of March 18, 1997, with the directive that, on May 1, 1997, the Defendants would present an accounting to be prepared in conjunction with the anticipated completion of their federal income tax returns on April 15, 1997. The May 1, 1997, trial date was continued again until May 19, 1997, when the Defendants' tax returns were still not completed as of May 1, 1997. The Defendants, although compelled to provide same by May 15, 1997, per our Order of May 13, 1997, on the Plaintiffs' motion to compel discovery, did not present an accounting to the Plaintiffs until the morning of May 19. Beatrice Taylor, not an accountant but a self-styled "enrolled agent," appeared at the trial to explain a Statement of Income and Retained Earnings for Year Ended 12/31/96 ("the Statement") prepared by her. The Statement recites sales of $223,320.60; gross profits after purchases of pretzels and other funds and supplies of $110,334.34; "operating expenses," which include expenditures on the House, totalling $89,668.88, leaving a net profit of $23,317.38; partnership draws of $17,378.00; and "retained earnings" of $5,939.00.

After the trial, the parties were accorded until May 30, 1997, to remit post-trial submissions, which were submitted in timely fashion.

## C. ISSUES PRESENTED

The Proceeding presents several questions to be answered by us. First, was the Debtor wrongfully excluded from the partnership or did he simply withdraw from it? Second, when did the partnership "dissolve?" Third, depending largely on the answers to the first two questions, to what damages, if any, are the Plaintiffs entitled?

## D. DISCUSSION

1. *The Debtor Appears to Have Been Wrongfully Excluded from the Partnership in Violation of the Parties' Informal Agreement, Although This Exclusion Was Not Without Some Justification.*

The threshold issue is a factual question of whether the Debtor was wrongfully expelled by the Defendants from the partnership, or whether the Debtor caused his own termination from the partnership by failing to fulfill his duties as a partner. The Defendants initially attempt to turn this issue upon the Plaintiffs by arguing that not only did they not wrongfully expel the Debtor from the Business, but rather that the Debtor himself breached the oral partnership agreement and subsequently disassociated himself from the Business, and therefore that his own acts caused dissolution of the partnership in January 1996. In particular, the Defendants claim that the Debtor failed to replace the $500 bad check which he gave to Smith; used the initial $110 deposit for personal expenses; was unable to devote his share of time to the business operations; and finally stopped communicating with the Defendants beginning in January 1996. The Defendants claim that each of the Debtor's aforesaid acts contributed to increasing tension and distrust between the partners, which led to the partnership's dissolution in January 1996. In sum, the Defendants claim that the Debtor, by his actions, wrongfully terminated the partnership as of January 31, 1996.

However, based on the reasoning in *Potter v. Brown*, 328 Pa. 554, 195 A. 901 (1938), we conclude that the Debtor's alleged wrongful acts were insufficient to trigger a dissolution of the partnership. The *Potter* court noted that " 'it is not for every trivial departure from duty or violation of the articles of partnership, or for every trifling fault or misconduct that courts of equity will interfere and decree a dissolution.' " *Id.* at 562, 195 A. at 904 (quoting Story on Partnership, § 287). Although the Debtor's misuse of $110 in partnership funds was technically "misconduct," the sum at issue was minimal. The failure to reimburse Smith for the $500 bad check was more of a personal wrongful act against Smith than an act against the Business, but arguably was also "misconduct" *inter se* the partners. However, the amounts, even when put together, are relatively inconsequential in light of the Business's 1996 gross income of over $200,000. Certainly a $610 offset could have been effected in any future distributions to the partners. We believe that these minor infractions are insufficient to trigger a dissolution of the partnership. Thus, we regard as misguided the Defendants' efforts to rely upon the Debtor's departures from his partnership duties to support their position that the Debtor, by his wrongful acts, effected a dissolution of the partnership.

Furthermore, the Debtor did not evidence any intent to voluntarily withdraw from the partnership. To the contrary, the Debtor indisputably made efforts to remain associated with the partnership and to maintain good relations with the Defendants despite his financial troubles. For example, the Debtor notified Smith in advance that there were insufficient funds underlying the $500 check given to him. We perceive no showing of intentional deceit or ill-will on the part of the Debtor in the acts described such as would support the conclusion, as claimed by the Defendants, that the Debtor willingly effected a dissolution of the partnership.

The Debtor's argument in support of his wrongful expulsion by the Defendants, on the other hand, more logically explains his disassociation from the Business. In essence, the Debtor argues that the Defendants engaged in several definitive steps to ensure his exclusion from the partnership. An analogous situation appeared in *Herman v. Pepper*, 311 Pa. 104, 108, 166 A. 587, 588 (1933), where the facts presented were found sufficient to constitute an expulsion of a partner from a partnership. In *Herman* the partner denied that the plaintiff had a standing as a partner, that he had any interest in the partnership property, or that he should have had any voice in the management of the enterprise. The court held, however, that, because the plaintiff was completely excluded from participation in the partnership's affairs, he was entitled to a declaration of the dissolution of the partnership. *Id.* at 108, 166 A. at 588–89.

Similarly, in the case at bar, the Defendants' treatment of the Debtor resulted in the exclusion of the Debtor from the partnership's affairs. First, the Defendants refused to allow the Debtor to participate in the daily operation of the Business after his hospitalization. Second, upon discovering the Debtor's hospitalization, the Defendants immediately notified PNC that there were problems in the partnership and placed an "alert" on the account which was operative only upon an attempt by the Debtor to withdraw funds from the account. The Defendants then proceeded to open a new account bearing only their names. Thus, the Debtor was excluded from all financial matters related to the Business and the partnership in general. After January 1996, the Defendants clearly considered the Debtor to be excluded from the partnership. Most notably, they did not obtain the Debtor's consent for, nor give him notice of, their purchase of an investment property, *i.e.*, the House, with partnership funds, thereby depriving the Debtor of any managerial and decision-making authority as a partner.

These events indicate that the Defendants took unequivocal measures to strip the Debtor of all of his rights as a partner, thereby excluding him from the operation and management of the partnership. The Debtor thus has sufficiently established that he was wrongfully expelled from the partnership by the Defendants.

On the other hand, we cannot say that the Defendants' actions were without some de-

gree of justification. The Debtor had taken certain actions which, while not sufficient to effect a dissolution of the partnership, were wrongful. The Debtor's mental problems, illness, and financial difficulties were a strain on the fledgling enterprise at a critical period in its development. The record also fails to clearly develop the efforts of the Debtor to make his perceived continued interest in the partnership after January 1996 known to the Defendants.

■ Finally, the Debtor filed the instant voluntary bankruptcy case on September 11, 1996. This filing reflects an intention to dissolve the partnership on that date, as a bankruptcy filing by a partner is a statutory cause for dissolution of a partnership. *See* 15 Pa.C.S. § 8353(4).[2] All of the foregoing are factors which we consider in assessing the Debtor's damages. *See* pages 353–355 *infra.*

2. *Irrespective of Who Is Determined to Be at Fault in Effecting its Dissolution, the Partnership Must Be Deemed Dissolved No Later than January 31, 1996.*

■ We next turn to the determination of the date of dissolution of the partnership. To determine the date of dissolution, it is necessary first to consider the cause of dissolution. Under the Pennsylvania Uniform Partnership Act ("PUPA"), specifically 15 Pa. C.S. § 8353(1)(iv), dissolution is caused by the "expulsion of any partner from the business...." Several cases expressly state and apply the rule that "[t]he exclusion of one partner by another from the management of the partnership business or possession of the partnership property is undoubtedly ground for dissolution by a court of equity." *Herman, supra,* 311 Pa. at 108, 166 A. at 588. *See also, e.g., Girard Bank v. Haley,* 460 Pa. 237, 243, 332 A.2d 443, 446 (1975); and *Potter, supra,* 328 Pa. at 561, 195 A. at 903–04.

Having established that the Debtor was excluded from the partnership by the Defendants, it follows that the Debtor's expulsion constitutes grounds for the dissolution of the partnership.

■ As to the date of dissolution, we accept the Defendants' argument that, as of January 31, 1996, the partnership was effectively dissolved. The evidence, as discussed above, establishes that the Debtor was not actively involved in the partnership by the end of January 1996. The Debtor had ceased working at the Business and had no access to the partnership funds as of January 31, 1996.

We reject the Debtor's argument that dissolution can only be said to have occurred when he "manifested an unequivocal election" to dissolve the partnership on January 31, 1997, by filing the Proceeding in issue. The Debtor's argument is fundamentally inconsistent with his own position that he was wrongfully expelled from the partnership in January 1996. Thus, on the one hand, the Debtor relies on events that transpired mostly in January 1996, to establish that he was wrongfully expelled from the partnership, *e.g.,* the Defendants closed the business account and refused to allow him to work at the Business. On the other hand, the Debtor argues that he was still in contact with the Defendants and was a "part" of the partnership until January 1997. Having established that the Debtor was wrongfully expelled from the partnership based on events occurring before January 31, 1996, the Debtor's subsequent filing of the Proceeding is irrelevant to the date of dissolution. We also note that the Debtor's bankruptcy filing on September 11, 1996, also effected a dissolution of the partnership no later than that date. *See* page 352 & n. 2 *supra.* Thus, the partnership must be deemed to be dissolved as of January 31, 1996.

2. Throughout the Proceeding, the Debtor erroneously referenced the bankruptcy filing date as November 14, 1996, the date of the reinstatement of the case after its dismissal. While this court held, in *In re Clinton Court,* 160 B.R. 57, 58–60 (Bankr.E.D.Pa.1993), that a bankruptcy filing by a partner should not preclude a partnership from filing a bankruptcy case, on the grounds that this result would violate 11 U.S.C. § 365(e)(1), the partnership is not a debtor here. Thus, § 365(e)(1) does not come into play. It therefore appears that, were it not dissolved earlier, *see* pages 352–353 *infra,* the partnership would necessarily have to be held to have been dissolved as of September 11, 1996.

**3.** *The Plaintiffs Are Nevertheless Entitled to Damages Measurable by Profits Earned for Some Period Beyond the Date of Dissolution of the Partnership.*

The final issue before this court is the determination of the damages to be awarded to the Debtor. PUPA provides at 15 Pa.C.S. § 8335(1) that any partner shall have the right to a formal account as to the partnership affairs "if he is wrongfully excluded from the partnership business or possession of its property by his copartners." Furthermore, the relevant portion of § 8331(1) states that "[e]ach partner shall be repaid his contributions, whether by way of capital or advances to the partnership property, and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied."

This conclusion is also supported by PUPA at 15 Pa.C.S. § 8360. Specifically, 15 Pa.C.S. § 8360(b) provides as follows:

**(b) Dissolution in contravention of agreement**—When dissolution is caused in contravention of the partnership agreement, the rights of the partners shall be as follows:

(1) Each partner who has not caused dissolution wrongfully shall have:

(i) All the rights specified in subsection (a) [entitling the excluded parties to his share of the business's net profits];

(ii) The right, as against each partner who has caused the dissolution wrongfully, to damages for breach of the agreement.

This statute further provides that the partners remaining after a dissolution may continue the partnership business, irrespective of whether they wrongfully caused the dissolution, although the parties acting wrongfully are obliged to indemnify the wronged partner for the value of his interest and any future partnership liabilities. 15 Pa.C.S. §§ 8360(b)(2), (b)(3).

■ Indeed, it is well settled in the relevant caselaw that, ordinarily, a withdrawing partner is entitled to a full accounting of all the assets and earnings of the partnership thereof through valuation, of which the ex-

tent and amount of the share payable to him is governed by the terms of the dissolution as provided in the partnership agreement, irrespective of who was at fault in causing the dissolution. See *Zebley v. Ostheimer*, 368 Pa. 21, 22, 81 A.2d 546, 547 (1951); and *Bracht v. Connell*, 313 Pa. 397, 402, 170 A. 297, 300 (1933) (terminated partner is entitled to receive the value of his partnership interest or to require the other partners to account for his proportion of the profit).

As to the extent of damages to which an expelled partner is entitled, the court in *Nachtrieb v. Harmony Settlement*, 17 F.Cas. 1139, 1145 (W.D.Pa.1855), stated that "[b]y [the Defendants'] wrongful expulsion of the complainant, the whole power and force of the articles as between them is broken, and inter sese, annulled; and the complainant has a right to separate use of his heretofore undivided interest in the property, because he is wrongfully deprived of his joint use of it." Furthermore, "the proper measure of his compensation is the amount of his interest or share *at the time of his expulsion.*" *Id.* at 1145–46 (emphasis added). *See also, Remic v. Berlin*, 284 Pa.Super. 489, 492, 426 A.2d 153, 154 (1981); and *Wolf v. Baltimore*, 250 Pa.Super. 230, 235–36, 378 A.2d 911, 913 (1977).

■ We previously concluded that the Debtor was effectively expelled from the partnership and the partnership was dissolved as of January 31, 1996. According to *Nachtrieb*, January 31, 1996, is the date at which the value of the Debtor's interest in the partnership should be measured. However, we do not agree with the Defendants' apparent contention that the value of the Debtor's interest must be limited to the net profits earned by the Business through January 1996. Rather, it is apparent that the Business, which was profitable from its inception, had a value which included the expectations of future profits for at least some period after the dissolution. Thus, PUPA provides, at 15 Pa.C.S. § 8360(b)(1)(ii), that a partner who has not caused a dissolution is entitled to any measurable damages caused by a breach of the agreement as well as his rights to net profits accruing as of the date of

the dissolution. 15 Pa.C.S. §§ 8360(b)(1)(i), (a).

4. *The Plaintiffs Are Entitled to Monetary Damages of $5,000, Initially Payable to the Trustee, Plus Certain Declaratory Relief Relating to Post–Dissolution Activities of the Business.*

The only issue remaining is how we measure these damages. Perhaps because of the ultimate accessability to calendar year 1996 profit data, the Debtor appears to assume that the damages should be measured by awarding him one-third of the Business's 1996 net profits. The convenience of this measurement apparently motivated the Debtor's misguided argument that the partnership did not dissolve until January 31, 1997, when the Proceeding was filed, as a means of contending that the profits of the Business for the entire year of 1996 should be the basis of his damages.

In rejecting the measurement of damages due to the Plaintiffs as co-equal with the profits of the Business in calendar year 1996, we do not mean to suggest that review of these profits is irrelevant to our calculation. It is the only evidence that we have in the record regarding the value of the Debtor's expectations of profits of the Business from which the Debtor has been deprived.

Moreover, having said that the Debtor was deprived of certain opportunities in the Business by the Defendants' wrongful acts, we add two caveats which cause us to measure the Debtor's damages rather conservatively. First, we reiterate our prior statements that the Defendants' actions were not without some degree of justification. *See* pages 351–352 *supra.* Second, we note that the Debtor is seeking what is in one sense a windfall. He has not put any time or money into the Business since January 1996, and the Business has prospered with its management solely at the hands of the Defendants.

Our starting rather than our ending point is therefore the Statement submitted by Taylor. There is no evidence as complete as the Statement which sets forth the 1996 activities of the Business. However, we do not agree that the Statement properly allocates certain of the alleged "operating expenses" to the Business. Notably, the Defendants' expenditures in the House have no relationship to the Business and must be deemed an independent activity of the Defendants individually for which, in at least the context of this calculation, it would be unjust to tax the Debtor's interest in the partnership. Other so-called "operating expenses" are not explained by the documents of record nor Taylor's testimony. Deduction of the following entries will therefore be effected as attributable solely to the House (H), or as not proven as likely to be attributable to the Business (N) in making our calculation: Insurance (H) $818.97; Legal & Accounting Fees (N) $600 of $1,403.87; PECO (H) $82.89; Interest Expense (N) $1,280.32; Quality Real Estate (H) $5,005.00; Depreciation (H) $797.00; and Improvements (H) $1,867.00. We also note, among Taylor's supporting documents, the following entries, which are not allowable but were most probably deducted in the Statement in some fashion: Mortgage Services (H) $2,840.95; and Wedding Contribution (N) $100.00.

The foregoing disallowances total $13,392.12. Adding this figure to the net profits results in our calculation of adjusted net profits totalling $36,709.51. We are prepared to allow the Plaintiffs to recover about six months' worth of these profits, amounting to one-seventh of this figure, or $5,000, as his damages.

The parties both present wildly distinct calculations which reach other results. The Debtor seizes upon alleged deposition testimony that the Defendants reported 1996 gross receipts of $218,726.15 and expenses of $148,389.36. He therefore seeks one-third of the $70,336.70 difference. In addition he requests attorneys' fees of $10,546.27, the right to which is not explained. *See e.g., Key Tronic Corp. v. United States,* 511 U.S. 809, 814–15, 114 S.Ct. 1960, 1964–65, 128 L.Ed.2d 797 (1994); *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247–71, 95 S.Ct. 1612, 1616–28, 44 L.Ed.2d 141 (1975); and *In re Barrett,* 136 B.R. 387, 394 (Bankr. E.D.Pa.1992) (parties must pay their own attorneys' fees in the absence of contractual provisions or fee-shifting statutes providing

otherwise). We do not accept the figures for gross receipts and expenses claimed by the Debtor to be based on the deposition testimony to be as final and complete as Taylor's Statement. Contrary to the Debtor's contention, the Defendants in no sense conceded the accuracy of these figures. Rather, at the depositions, they claimed that accurate calculations had not yet been completed. And, again, the Plaintiffs' damages are only appropriately measured by a smaller fraction of the Business's net profits because of the Defendants' justifications for their actions and the windfall which any additional damages would confer upon the Debtor.

The Defendants, meanwhile, gratuitously, and in no way supported by the record, allow themselves $20,000 for the cost of winding up the partnership; deduct $2,300 from the Debtor's share for "bad checks and personal checks;" disallow only a few charges for the House; and conclude that the Debtor owes the Defendants $1,179.44. We are unwilling to accept any of these revisions as supported by the record or logic.

Since the record also fails to reflect any claim of exemption by the Debtor of any recovery by him in the Proceeding, we will order the $5,000 damages paid to the co-plaintiff Trustee. Our order shall also include a declaration that the partnership was dissolved as of January 31, 1996, and shall direct the Defendants to indemnify the Debtor for any liabilities which might be claimed against him by third parties asserting rights against the partnership.

## D. CONCLUSION

An order providing as indicated will be entered.